**REMINGTON–RAND, Inc., v. SHAW–WALKER CO.**

**No. 6220.**

Circuit Court of Appeals, Sixth Circuit.
June 6, 1933.

R. W. Treverton, of Buffalo, N. Y. (Barton A. Bean, Jr., of Buffalo, N. Y., and Allen & Allen, of Cincinnati, Ohio, on the brief), for appellant.

Clarence E. Mehlhope, of Chicago, Ill. (Walter A. Scott and James R. Offield, both of Chicago, Ill., on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The appeal is by the plaintiff below from a final decree in a patent infringement suit dismissing the bill of complaint therein because of noninfringement. The patent in suit is reissue patent No. 15,529 to Dick and Wolters, granted January 18, 1923, for a heat-resisting cabinet and method of making the same, and was previously adjudicated and held valid as against other defendants in Remington Rand, Inc., v. Art Metal Construction Co., 34 F.(2d) 693 (D. C. N. Y., W. D.), affirmed 45 F.(2d) 136 (C. C. A. 2).

The invention relates to the safe art, particularly to cabinets or light-weight safes intended for use as containers for valuable papers, documents, and records. It discloses a construction combining with the absence of great weight elements to resist the entrance of heat to the interior, and providing strength and rigidity to prevent buckling under high temperature, or injury from fall or rough handling. The structure described and illustrated comprises an outer shell of sheet metal, with an inner shell which is a composite insulating lining cast in one piece, and within which is embedded wire mesh for reinforcing purposes. The lining is molded to shape from a mixture of gypsum, sawdust, and water (stucco), which is allowed to harden or set in a mold and is then removed and dried to extract free water and leave only chemically bound water. The drying process is for the purpose of obtaining the desirable lightness of weight, the prevention of rust in the metal parts of the safe, and the elimination of flaws or defects in the lining which necessarily exist if uncombined moisture is allowed to remain therein.

The claims in suit are directed solely to the monolithic cast, claims 3, 4, 5, 7, and 8 being for an article of manufacture, and claims 18, 19, and 22 for a method.

Claim 3 is typical of the article claims: "A composite structure, suitable for use as a safe or a safe lining, formed in one piece from suitable materials mixed with water, said structure when cast and set having the free water removed therefrom, leaving only the chemically bound water therein."

Claim 22 is a typical process claim: "The method of making fire-resisting safes, or linings for safes, which consists of the follow-

ing steps or stages: The preparation of a mixture of suitable material with water substantially as described, preparation of a suitable mold having mounted therein a network of reinforcing material, then pouring the fluid mixture into the mold so that the reinforcing material will be incorporated in the cast, and subjecting the cast to a drying process to an extent sufficient to eliminate from the cast the free water contained therein, and yet not sufficient to release the moisture which is chemically bound with the material of which the cast is formed."

The defenses are invalidity and noninfringement, and for a better understanding of the precise issues involved, it is desirable at this point to note briefly the defendant's method and the character of the product produced thereby. The defendant likewise manufactures and sells a light-weight insulated metal cabinet or safe. Its method of forming the insulation involves preliminary fabrication of the outer casing or shell of sheet metal, its corner seams sealed by welding and its interior coated with water-proof paint. The reinforcing wire mesh is then applied and a removable form inserted, fashioned to provide the desired inner configuration of the safe. Plates are applied against the exterior walls to hold them from bulging, and the wet insulating material is then poured into the interior of the safe. When the lining has set the inner form is removed, and after a period the casings are placed in a kiln, where they are dried.

Returning to the patent in order to ascertain the advance made over the prior art, and to sense the inventive concept, we find the patentees describing their invention as follows: "Our invention relates to the method or process of making of said linings, objects of which are as follows: To produce light-weight safe linings by normal, economical and effective methods; to produce by a new and economical method, a composite hollow heat-resisting structure which is adapted for use as a safe and as the lining of metal safes, and which is light, strong and durable; to provide a method by which the free water is eliminated from the aforesaid structure, leaving only the chemically bound water which is efficaciously utilized in the presence of high temperature to which the safe may be subjected in case of fire; *to provide a method of making safe linings by which the latter are produced independently of the safe structure or walls* and embodied in the safe during the process of making the latter; and to include in the method of making the lining or casting a step involving the reinforcement

of the latter so that it is held as an integral unit."

Specifically describing their forward step, the patentees further state:

"Our present invention is superior to the double-walled sheet-metal cabinet in which heat-insulating materials are placed between the said walls, in that our insulation is one integral member with no joints, seams or openings of any kind, cast in a mold to fit perfectly its outer shell of sheet metal, and *pre-dried at a fixed temperature,* so that the exact amount of moisture best calculated to provide heat insulation remains chemically bound in the said casting."

"Another advantage arising out of forming the heat-insulating lining outside of the casing walls lies in the fact that, after the molded lining is removed from the mold it can be inspected, and if there are any air holes or defects of any kind caused by lumps in the mixture or the presence of any undissolved substances, they may be remedied *before the lining is positioned in the casing.*"

Again referring to the prior art, the patentees specify: "We overcome all the defects and objections presented in the prior art in that we produce a composite structure cast from a plastic mass from which all the free water has been abstracted in a drying room at a fixed temperature leaving only the chemically bound moisture. This materially reduces weight, avoids corrosion of the metal walls of the safe and eliminates 'sweating.' Moreover, *we cast the plastic mass in a mold independently of the safe walls,* thus enabling examination to be made when the casting is out of the mold, permitting defects to be remedied and tests to be made as to the condition of the casting. Thus the cast is produced as an article of manufacture ready for use and sale and does not have to await the evaporation of the moisture during a long period of years, nor can it deteriorate in any way during usage for a period of years, since shrinking and cracking cannot occur. *The casting * * * is completed before it is placed in the safe as a lining therefor.*"

The court below, as did the Circuit Court of Appeals for the Second Circuit in the Art Metal Construction Company Case, found the inventive concept to reside in a product and method which results from and incorporates the pre-casting and pre-drying of the monolithic or composite structure which may itself be used as a safe, or as a lining for a safe. The pre-casting and pre-drying were found to be essential, or at least highly important, for the purpose of ef-

fectively removing the surplus of free water during manufacture, for discovery of defects, and for ascertaining uniformity of dryness with scientific exactness before final assembly.

It being quite obvious, even from the brief description we have given of the defendant's product and method, that it pours its wet lining material directly into the casing, and that it does not pre-cast or pre-dry the lining, it would seem that the court below was right in finding noninfringement, and that in the light of the Art Metal Construction Company Case validity of the claims in suit might here also be assumed, and decision rested, as below, upon noninfringement. The plaintiff, however, vigorously challenges the lower court's construction of the claims in suit, and its understanding of the inventive concept. It urges upon us the view that the patent discloses two inventions; the primary invention dealing with the dry monolithic cast, and a secondary invention relating to the insertion into an outer shell of a pre-cast and pre-dried composite lining. It points out that the group of claims which contain limitations providing for pre-casting and pre-drying of the lining are not in suit, but that broader claims are relied upon which contain no limiting requirement for the pre-casting and pre-drying of the safe lining. It is insisted that the plaintiff's rights are to be ultimately tested by the claims in suit, and that we are not warranted in construing into any of the claims in issue a limitation they do not contain. Veneer Machinery Co. v. Grand Rapids Chair Co., 227 F. 419 (C. C. A. 6); National Tube Co. v. Mark, 216 F. 507 (C. C. A. 6); Peerless Wire Fence Co. v. Jackson Fence Co., 226 F. 774 (D. C.).

Were we to concede that there are no limitations in the controverted claims, either for product or process which confine them to pre-cast and pre-dried linings, it would seem to us extremely difficult to sense invention even to the extent of assuming their validity for purpose of decision upon the question of infringement. The prior art discloses the casting of wet gypsum into the walls of a safe, as in the patent to Fitzgerald, No. 3,117, as early as June 1, 1843, and of other compositions in Marvin, 40,799, and Butler, 152,958. There was no novelty in reinforcing cement or stucco with wire mesh, and it is clear from the testimony of the patentee, Wolters, that there were single block or monolithic linings prior to the disclosure of the patent. All that is then left of novelty in the so-called primary invention urged upon us

by the plaintiff is its drying process, a process frankly devised to accelerate artificially for economic reasons a result which unaided nature would inevitably bring. It seems to us that the plaintiff belittles the inventive concept of the patent, and so narrows its effect upon the art that substantially nothing is left. It would indeed be difficult to say that there is either novelty or invention in applying heat to a wet composition in order to dry it.

But the claims in suit are not without the limitation noted. They call for an article of manufacture "suitable for use as a safe or a safe lining," and for a method of making "fire-resisting safes or linings for safes." In so far as they call for structures suitable for safe linings they call for pre-cast and pre-dried structures, implicitly if not indeed expressly, and since the defendant does not pre-cast or pre-dry its safe linings, it does not invade the claims, and failure to sue upon those claims more aptly containing the limitation seems to be sufficient concession, if evidence were wanting, that the defendant does not pre-cast or pre-dry its safe lining.

Nor can it be successfully contended that the defendant's unitary structure, the completed safe with its monolithic lining, is as an article of manufacture the composite structure suitable either for a safe or safe lining described in claim 3. It is true that the defendant produces a monolithic form of composite lining, and that this is artificially dried, but this is not produced as a separate article of manufacture suitable for a safe lining. The defendant's lining is integral with and inseparable from the metal outer shell from the time it is first poured. It is perhaps true that at great labor and expense the outer shell can be removed from the defendant's structure, and that what is left will then be a substantially dry monolithic composite structure upon which the claims of the patent may fairly read. We are dealing, however, with practical things in a practical art. The defendant does not produce nor pretend to produce a safe lining as a separate article of manufacture. There is no evidence that it has ever made or sold anything to be used for that purpose. If it did the plaintiff might well have ignored any competition that could conceivably have resulted from such useless and expensive effort.

We have refrained from discussing many of the advantages claimed by the patentees, both for their product and method, and from pointing out wherein the defendant fails to achieve such advantages, and we have likewise refrained from a more detailed comparison of the defendant's product and method with those of the prior art, because these matters are so well and so fully covered by the opinion below. It is sufficient to say that we are content to assume that the controverted claims of the patent in suit are valid, and that so assuming we find nothing in the defendant's structure or method which infringes.

The decree below is affirmed.